# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## SPARTANBURG DIVISION

UPSTATE ORAL & MAXILLOFACIAL
SURGERY, P.A. and
UNION COUNTY EMS SC individually and on
Behalf of all others that are similarly situated

          **Plaintiffs,**

   **v.**

AIRGAS USA, LLC

        **Defendant.**

**Case No.: 7:19-CV-02889-DCC**

**CLASS ACTION**

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs Upstate Oral & Maxillofacial Surgery, P.A. and Union County EMS SC file this Second Amended Class Action Complaint against Defendant Airgas USA, LLC on behalf of itself and all others that are similarly situated.  In support thereof, Plaintiffs state the following:

### I.     NATURE OF THE CASE

1.     Plaintiffs brings this action to challenge Airgas's widespread and systematic practice of overcharging thousands of customers relatively small amounts of money through "fuel surcharges" which are not—as mandated by uniform contractual provisions—charged to recoup "extraordinary, emergency, or other unanticipated increases in the cost of manufacturing, supplying or distributing" products.

2.     Airgas is one of the largest suppliers of gases in the United States, with more than $5 billion in annual revenue. It markets, sells, and distributes gas products and supplies to hundreds of businesses and consumers like Plaintiffs. Many of these customers, like Plaintiffs, enter into form agreements that are standard in all relevant ways.

3.      These form agreements establish that—in addition to the set rates Airgas charges its customers for products and services—Airgas can only impose other fees in very specific circumstances. Specifically, it provides that Airgas can assess a surcharge "only in the event of any extraordinary, emergency or other unanticipated increases in the cost of manufacturing, supplying or distributing Product hereunder."

4.      Based on the terms of this uniform provision, in 2015 Airgas implemented a "fuel surcharge" across its customer base. It purportedly did so to recover and pass-through "extraordinary, emergency or other unanticipated" fuel costs it incurred in providing services. Its use of this term ("fuel surcharge") was not accidental; as multiple courts have recognized, the term "fuel surcharge" has a specific, understood meaning and in using this term, Airgas represents that it charges the fuel surcharge to recover the increased fuel costs it incurs in delivering products to its customers, that the fuel surcharge varies in accordance with Airgas's increased fuel costs, and that the revenue from the fuel surcharge is used to offset those increased costs.  This meaning comports with the contractual language under which Airgas imposes the fuel surcharge.

5.      However, in truth, Airgas's fuel surcharge program was created and imposed solely to recoup additional profit at its customers' expense. There was no "extraordinary, emergency, or other unanticipated" event that gave rise to this fee. Indeed, when Airgas created the fuel surcharge program, it designed the program to recover more than its budgeted, planned fuel costs and the fuel surcharge has done so ever since. The "event" that Airgas bases the imposition of its fuel surcharge upon never happened. Further, Airgas recovers any increases in fuel costs it might incur in delivering products through a separate "delivery fee" that it also imposes on customers, as well as through the base prices it charges and increases to those prices. The fuel surcharge has no relationship to increased fuel costs, much less to "unanticipated" increased fuel costs, and is not

charged to recover such costs; it unlawful in its entirety.

6.     Airgas's conduct constitutes a clear breach of contract, a violation of the duty of good faith and fair dealing that underpins that contract, and, alternatively, has resulted in Airgas's unjust enrichment. Further, this case presents a prototypical situation for class treatment. Airgas's conduct—including all relevant practices, contractual terms, representations, and omissions—is uniform among all customers. The application of uniform law to a common course of conduct will determine liability for the classes as a whole, ensuring that the rights of thousands of small businesses are vindicated through the efficiency of a single trial.

## II.     JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $5,000,000, the proposed class consists of more than 100 members, and minimal diversity exists (Plaintiffs are residents of South Carolina and Defendant's only member, Airgas, Inc. is a citizen of Pennsylvania and Delaware).

8.     This Court has personal jurisdiction over Airgas USA, LLC because it is authorized to do business in and in fact does business in this District. The conduct at issue in this case occurred in this District, and Airgas USA, LLC could reasonably anticipate litigation in this District under traditional notions of fair play and substantial justice.

9.     Venue is proper in this Court under 28 U.S.C. § 1391. Plaintiffs are located in this District and the conduct giving rise to Plaintiffs' claims occurred in this District. The contractual agreement at issue was made and is to be performed in this District. The causes of action originated in this District and the fees at issue were charged and paid in this District.

## III.     PARTIES

10.     Plaintiffs Upstate Oral & Maxillofacial Surgery, P.A. is a South Carolina entity

with its principal place of business in Spartanburg County, South Carolina.

11.     Plaintiffs Union County EMS SC is an emergency medical services entity located and operating in Union County, South Carolina.

12.     Plaintiffs' experiences with Airgas are typical of the classes they seek to represent in all relevant aspects.  Plaintiffs each entered into form contracts with Airgas containing identical language governing the "fuel surcharge" at issue.  Plaintiffs were affected and damaged by Airgas's unlawful practices complained of herein.

13.     Airgas USA, LLC is a wholly-owned subsidiary of Airgas, Inc., a Delaware corporation with its headquarters in Pennsylvania. Airgas USA, LLC is the entity that is responsible for the conduct at issue herein and which received the revenue form the fees and pricing practices at issue herein.

## IV.     FACTUAL ALLEGATIONS

14.     Airgas is one of the largest gas distribution companies in the United States, with more than a million customers and over $5 billion in annual revenue.

15.     Plaintiffs are local entities in South Carolina which require gases and related equipment for their operations.  Like thousands of other customers across the country, most of them small businesses, Airgas agreed to provide these products to Plaintiffs in exchange for set prices. And, like thousands of other customers, Airgas it did so by entering into a form agreements that were drafted by Airgas with no opportunity for meaningful alteration. In the case of Union County EMS SC, this agreement was contained in a written form document.  In the case of Upstate Oral & Maxillofacial Surgery, P.A., this agreement was contained in online terms and conditions which were incorporated into every sale at issue through paper invoices and delivery orders.  For both types of agreements (written or online), Airgas included a standard, identical provision which

4

established in when it may impose surcharges in addition to the prices charged. The relevant provision states that:

> SURCHARGES. Following notice from Seller, Buyer shall pay to Seller a surcharge in the event of any extraordinary, emergency or other unanticipated increases in the cost of manufacturing, supplying or distributing Product hereunder.

16. Notably, this provision has been identical at all relevant times and for all putative class members.

17. The correct role of this provision is apparent from its plain language: it allows Airgas to pass-through increased costs it incurs in the form of a "surcharge," but only in the event that such increases are "extraordinary," "emergency," or otherwise "unanticipated." Increased costs that Airgas foresees cannot be recovered through such surcharges because they can be reasonably accounted for by Airgas through other means, such as the base prices and other fees it assesses.

18. Indeed, this contractual language comports with the common, understood meaning of "surcharge" recognized by multiple courts. That is, a "surcharge" is "an additional charge or payment" assessed to pass-through a specific unanticipated cost event. The term "fuel surcharge" has a common, understood meaning for any reasonable consumer, including for Plaintiffs and putative class members, as a fee charged to recover unanticipated increased fuel costs incurred by the provider, which is related to such costs, and which is used to offset or recover such costs. Multiple courts have recognized that the usage of this specific term conveys this meaning to customers. *See, e.g., Deere Constr., LLC v. Cemex Constr. Materials, LLC,* 198 F. Supp. 3d 1332 (S.D. Fla. 2016) ("What is allegedly deceptive is that the so-called 'fuel surcharges' and 'environmental charges,' labeled as such by Defendants, were not in fact designed to cover

anything related to fuel or the environment. Defendants chose the two adjectives that describe the fees being assessed. Each adjective carries meaning"); *Dover v. British Airways, PPLC (UK)*, 2013 WL 5970688, at \*4 (E.D.N.Y. Nov. 8, 2013) ("The plain meaning of the term 'fuel surcharge' is a supplemental charge that is reasonably related to or based upon the cost or price of fuel. This understanding comports with conventional usage.").

19.     Pursuant to the form provision in the contractual terms and this meaning, Airgas assess its customers a fee it calls a "fuel surcharge." It purportedly does so to recover the "extraordinary, emergency, and unanticipated" increased fuel costs it incurs in distributing products to customers pursuant to the standard surcharge contractual provision. Airgas uniformly uses the term "fuel surcharge" to charge this fee to Plaintiffs and putative class members. It does so consistently and continually, including every time it assesses the fee on monthly invoices. It charges fuel surcharge in a standard, uniform amount based upon the same purported justification.

20.     Airgas breached this contractual provision because there was no "extraordinary, emergency, and unanticipated" increased fuel cost event that gave rise to the fuel surcharge. Rather, Airgas created the fuel surcharge it in its current form in 2015 with the express, sole, and undisclosed purpose of generating unearned profit on the backs of its customers. Indeed, Airgas did not have any unanticipated increased fuel costs at that time or since. Upon information and belief, it set the base rate for the fuel surcharge at an artificially low level to create a "spread" that would ensure it created fuel surcharge revenue even when its fuel costs remained within anticipated amounts. Further, upon information and belief, Airgas employs a sophisticated budgeting process that anticipates and sets a budgeted fuel cost for the year and the fuel surcharge was not created, nor is it changed in any way, as a result of how fuel costs compare to such anticipated costs. Airgas has never had "extraordinary, emergency, and unanticipated" fuel costs and the charging of the

fuel surcharge is a breach of the terms of the uniform contractual surcharge provision.

21.     Additionally, Airgas already fully recovers the increased fuel costs that purportedly justify the fuel surcharge through a separate "delivery fee." Airgas does not incur any increased fuel costs outside those already recovered through these separate delivery fees, and Airgas increases the "delivery fee"—which is substantial, reaching more than $50 per delivery— routinely.  Through the delivery fee alone, Airgas recovers more than its entire increased fuel costs (anticipated or otherwise). Airgas further recovers its purported increased fuel costs through the prices and price increases it charges customers. These prices include the individual component costs of Airgas's business, including—specifically—the costs of fuel and other overhead. When setting prices and imposing price increases, Airgas takes into account its fuel costs to recover such costs.[1]

22.     Further, the "fuel surcharge" Airgas imposes is wholly unrelated to Airgas's actual or increased fuel costs and—in neither purpose nor effect—does it pass through such costs. The method by which Airgas determines the fuel surcharge has no relation to its increased fuel costs or to any changes in those costs. It is arbitrary in that the only driving factor is the profit Airgas seeks to derive from the fuel surcharge while maintaining the false appearance of the fee as a legitimate charge related to fuel costs. Airgas has done no legitimate analysis to determine the proper amount of the fuel surcharge in connection to its actual increased or decreased fuel costs. Airgas has no internal process or justification for the fuel surcharge and the methodology—or lack thereof—by which Airgas charges it demonstrates that this fee is actually a hidden price increase

---

[1] *See, e.g.,* https://www.airgas.com/medias/Jan-2017-News-Release-Airgas-Announces-Pricing-Actions.pdf?context=bWFzdGVyfHJvb3R8NDkyOTV8YXBwbGljYXRpb24vcGRmfGhhYS9oMTMvMTE0OTAwNTQ1NzAwMTQucGRmfDhiZTY5ZGU0MWE5ZTJjNjhkOTNlYzIzMzY1YzEzMTA3NzQ1MTIyMTY3ZWE0YTllYmI0OWQ5NmM3MTFiYzFiMjM.

that Airgas falsely represents to be a fuel surcharge imposed due to a fuel cost "event" that was unforeseeable and out of its control. Airgas does not apply the money received from the fuel surcharge to offset its increased fuel costs; rather, it is recognized as revenue and contributes directly to Airgas's profit. In fact, in its annual report filings, Airgas has stated that its "gross profits" increased year over year, in part as a result of "margin expansion on price increases and surcharges...."[2] The only way in which Airgas's profit margin increases based upon surcharges is when those surcharges are profit to begin with.

23.     Airgas's conduct in assessing the "fuel surcharge" not only violates the clear, uniform contractual requirement that it only do so in the event of "extraordinary, emergency, or unanticipated" increased fuel costs, it violates the duty of good faith and fair dealing and is fraudulent. By using the term "fuel surcharge"—as opposed to a fee term that is general or accurate, like "service charge" or "additional profit fee"—Airgas deliberately mislead Plaintiffs and putative customers as to the nature, purpose, and use of this fee. Airgas has intentionally deceived Plaintiffs into believing that the fuel surcharge is directly related to Airgas's actual fuel costs, is calculated using such costs, and will be used to offset such costs.

24.     Airgas also has omitted material facts regarding the fuel surcharge. For example, Airgas does not disclose that the fee is not related to Airgas's increased or actual fuel costs, that that Airgas's increased fuel costs are not a factor in the amount of the fuel surcharge, that the amount of the fuel surcharge is not tied to Airgas's increased fuel costs, and that the fuel surcharge is recognized as profit. Airgas does not disclose its actual fuel costs to customers, nor does it disclose the methodology, to the extent there is one, used to determine the amount of the fuel surcharge. In truth, Airgas devised, implemented, and set the amount of the fuel surcharge simply

---

[2] https://www.airgas.com/2015annualreport/download/airgas2015_management_dsc.pdf.

8

to increase its profits without any intent of recovering the increased energy costs they incur in servicing customers. Airgas knows when it enters into an agreement with a customer that the customer will pay substantially more than the agreed upon service rate through a fuel surcharge which is entirely unfair, deceptive and/or misleading. Airgas does not disclose this fact to its customers.

25.     Finally, to reiterate, Plaintiffs do not allege that they did not know about the "fuel surcharge" or that this fee was not listed as a "fuel surcharge" on the invoices Airgas sent every month. Rather, Plaintiffs alleges that the "fuel surcharge" is unlawful because it is not charged as the result of, or related to, any "extraordinary, emergency or other unanticipated increases in" any cost Airgas incurs.  This fee it is not—in design, intent, or effect—related to anything having to do with fuel or an increase in fuel costs.  And, as discussed below, neither Plaintiffs nor any putative class member could have known that the "fuel surcharge" is actually an illegitimate mechanism designed to increase profits rather than offset costs Airgas actually incurred, as the "methodology" and financial information which establish as much were withheld.

**A.     The Class Waiver In The Online Terms And Conditions Does Not Apply To The Written Contract Class By Its Own Terms, Is Unconscionable, and Is Not Supported By Consideration.**

26.      The online terms and conditions Airgas relies upon as the sole source of any purported class waiver specifically provide that they are inapplicable if "a separate written agreement" governs the relationship between the parties.  Each member of the Written Contract Class, including Plaintiff Union County EMS SC, entered into "separate written agreements" with Airgas. Therefore, by its terms, the online terms and conditions and the purported class waiver contained therein cannot apply to these claims.

27.     Further, even if applicable, the online class waiver is procedurally and substantively

9

unconscionable because the terms are so oppressive and on-sided that, were Airgas not to fraudulently hide the true nature of the fuel surcharges, no honest person would accept them. There was absolutely no meaningful choice for any customer with regard to the class waiver, and the class waiver is fundamentally unreasonable as its purpose and effect is to insulate Airgas from claims arising from egregious, and deliberate conduct. Indeed, class members are not notified regarding the purported class waiver which is not in the documents that are presented to them. These terms are the definition of a contract of adhesion. No putative class member may negotiate or alter these terms, as evidenced by the fact that no class member has actually done so. They are unilaterally drafted and enforced by Airgas at its sole discretion. Airgas maintains the "right" to modify the online terms without notice. Airgas has superior bargaining power to Plaintiffs and to any other putative class member, as evidenced by its size, market share, the uniformity of the online terms, and the unavailability of similar products in local marketplaces. Indeed, Airgas operates largely as a vertical monopoly with its parent company (Air Liquide), providing the products it sells and allowing Airgas to dominate competition through its pricing mechanisms. Upon information and belief, local Airgas employees coordinate with competitors to limit competition. Airgas used its superior bargaining power to uniformly take advantage. The setting of the class waiver establishes that it is unconscionable.

28.     Additionally, this provision effectively bars Airgas customers from ever vindicating their legal rights. This dispute involves predictably small amounts of damages. The fuel surcharges at issue amount to tens of dollars, at most, for any given month and the damages for a given customer will rarely if ever exceed a thousand dollars. There is no avenue under the contract for customers to recover their attorney's fees (although, of course, the contract unilaterally allows Airgas to do so). The costs of vindicating an individual customer's claims, when compared

to their potential recovery, is too great to allow any individual claim absent class treatment, and, unsurprisingly, no case other than putative class actions have been brought regarding this clear breach of contract to date due to that fact. The "price" of this waiver is extraordinarily high in comparison to any "value" it would provide. There is a public interest in support class actions in such circumstances which prohibits the enforcement of the purported class waiver. Indeed, the circumstances by which Airgas creates and enforces the class waiver effectively extinguish the claims and rights of the putative class. And, further, Airgas does so intentionally; having created a fraudulent scheme to deprive thousands of customers of small amounts of money without their knowledge, it then attempts to insulate itself from liability through an "online" class waiver that it never adequately discloses. The class waiver is hidden in an inconspicuous location at the end of a lengthy "online" document in small font without any distinguishing features. The effect and purpose of the class waiver establishes that it is unconscionable.

29.     Finally, the purported class waiver is unenforceable as not supported by mutual consideration. The online class waiver does not provide a mutual obligation to waive class treatment as there is no possible situation or legal mechanism by which Airgas would be a "plaintiff" or "class member" in a putative class action against a customer. Without mutuality of obligation, there is no contractual support for this provision which must be stricken.

**B.      The Class Waiver In The Online Terms And Conditions Agreement Is Unconscionable And Unenforceable Against Members Of The Online Contract Class.**

30.     The online class waiver is procedurally and substantively unconscionable and because the terms are so oppressive and on-sided that, were Airgas not to fraudulently hide the true nature of the fuel surcharges, no honest person would accept them. There was absolutely no meaningful choice for any customer with regard to the class waiver, and it is fundamentally

11

unreasonable as its purpose and effect is to insulate Airgas from claims arising from egregious, and deliberate conduct. Indeed, class members are not notified regarding the purported class waiver which is not in the documents that are presented to them. These terms are the definition of a contract of adhesion. No putative class member may negotiate or alter these terms, as evidenced by the fact that no class member has actually done so. They are unilaterally drafted and enforced by Airgas at its sole discretion.  Airgas maintains the "right" to modify the online terms without notice. Airgas has superior bargaining power to Plaintiffs and to any other putative class member, as evidenced by its size, market share, the uniformity of the online terms, and the unavailability of similar products in local marketplaces. Indeed, Airgas operates largely as a vertical monopoly with its parent company (Air Liquide), providing the products it sells and allowing Airgas to dominate competition through its pricing mechanisms. Upon information and belief, local Airgas employees coordinate with competitors to limit competition.  Airgas used its superior bargaining power to uniformly take advantage. The setting of the class waiver establishes that it is unconscionable.

31.     Additionally, this provision effectively bars Airgas customers from ever vindicating their legal rights. This dispute involves predictably small amounts of damages. The fuel surcharges at issue amount to tens of dollars, at most, for any given month and the damages for a given customer will rarely if ever exceed a thousand dollars. There is no avenue under the contract for customers to recover their attorney's fees (although, of course, the contract unilaterally allows Airgas to do so). The costs of vindicating an individual customer's claims, when compared to their potential recovery, is too great to allow any individual claim absent class treatment, and, unsurprisingly, no case other than putative class actions have been brought regarding this clear breach of contract to date due to that fact.  The "price" of this waiver is extraordinarily high in comparison to any "value" it would provide. There is a public interest in support class actions in

such circumstances which prohibits the enforcement of the purported class waiver. Indeed, the circumstances by which Airgas creates and enforces the class waiver effectively extinguish the claims and rights of the putative class. And, further, Airgas does so intentionally; having created a fraudulent scheme to deprive thousands of customers of small amounts of money without their knowledge, it then attempts to insulate itself from liability through an "online" class waiver that it never adequately discloses. The class waiver is hidden in an inconspicuous location at the end of a lengthy "online" document in small font without any distinguishing features. The effect and purpose of the class waiver establishes that it is unconscionable.

32.     Finally, the purported class waiver is unenforceable as not supported by mutual consideration. The online class waiver does not provide a mutual obligation to waive class treatment as there is no possible situation or legal mechanism by which Airgas would be a "plaintiff" or "class member" in a putative class action against a customer. Without mutuality of obligation, there is no contractual support for this provision which must be stricken.

**C.     Neither Plaintiffs, Nor Any Putative Class Member, Had Full Knowledge Or Paid The Fuel Surcharges "Voluntarily."**

33.     No putative class member, including Plaintiffs had "full knowledge" of the facts pertaining to the "fuel surcharge" such that their payment of these charges may be determined to be "voluntary" under applicable law.[3] For example, Airgas did not disclose—and in fact, actively concealed and misrepresented—the true nature and purpose of the fuel surcharges. It did not disclose that the fuel surcharge was not the result of any "extraordinary, emergency, or other unanticipated increase" in fuel cost, but rather was a profit device. The only method by which any

---

[3] "[D]etermining the state of Plaintiffs' knowledge, and thus the voluntariness of payment, are fact-intensive inquiries properly reserved for any motion or motions for summary judgment the parties may decide to file at the close of discovery." *In & Out Welders, Inc. v. Sunbelt Rentals, Inc.*, No. CV 7:16-04021-MGL, 2017 WL 2255780, at *3 (D.S.C. May 23, 2017).

customer could have determined the true nature and illegality of the fuel surcharge would involve information (such as financial data in Airgas's general ledger and high-level internal communications) that were never available to customers.

34.     Further, Plaintiffs and each putative class member was under a contractual, legal obligation to pay the invoiced charges to Airgas.  Upon information and belief, Airgas enforces its form contracts—including punitive measures and terms—to ensure that customers cannot escape them, even if such customers could have known that the fuel surcharges were unlawful and deceptive.  Thus, additionally, any payments could not be "voluntary."

## V.     CLASS ACTION ALLEGATIONS

35.     Plaintiffs brings this action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), and proposes the following classes:

**<u>The Written Contract Class:</u>** All persons or entities in the United States who (1) entered into a written form contract with Airgas that provides "Buyer shall pay to Seller a surcharge in the event of any extraordinary, emergency, or other unanticipated increases in the cost of manufacturing, supplying or distributing Product hereunder" and (2) paid Airgas a "Fuel Surcharge" at any time during the applicable statute of limitations.

**<u>The Online Contract Class:</u>** All persons or entities in the United States who (1) entered into the online "Terms and Conditions of Sale" contract with Airgas that provides "Buyer shall pay to Seller a surcharge in the event of any extraordinary, emergency, or other unanticipated increases in the cost of manufacturing, supplying or distributing Product hereunder" and (2) paid Airgas a "Fuel Surcharge" at any time during the applicable statute of limitations.

36.     Excluded from the proposed classes are persons or entities who entered a written

(not online) form contract with Airgas that contains a purported class waiver.  Also excluded from the proposed classes are putative class members as of the Online Contract Class in Georgia or Florida, members of the judiciary who preside over this case or related litigation, entities currently in bankruptcy, entities whose obligations have been discharged in bankruptcy, and governmental entities.

37.    Plaintiffs maintains the right to create additional subclasses or classes, if necessary. Plaintiffs also reserves the right to revise these definitions if discovery reveals that it is necessary to do so to maintain cohesive classes which do not require individual inquiry to determine liability.

**A.    Existence And Predominance Of Common Questions Of Law And Fact.**

38.    Airgas engaged in a common course of conduct which gives rise to common questions of law and fact which predominate in this litigation.  This common course of conduct— imposing fuel surcharges that were deceptive and unfair—effected class members in the exact same manner.  The amount of damages may differ among class members, but the fact and type of damages is uniform among all class members and flows directly from Airgas's common conduct.

39.    This shared nucleus of facts and law gives rise to numerous questions of law and fact which overwhelm any individual issues which might exist.  Such common questions include, but are not limited to, the following:

   a.    Whether Airgas used standard form documents with customers;

   b.    Whether Airgas charges customers a fuel surcharge;

   c.    Whether the fuel surcharge Airgas imposes is the result of "extraordinary, emergency, or other unanticipated increases" in fuel costs;

   d.    Whether the fuel surcharge Airgas imposes is reasonably related to Airgas's increased fuel costs;

    e.     Whether Airgas recovers the same costs which purportedly justify the fuel surcharge through the prices it charges and delivery fees;

    f.     Whether Airgas uses revenue from the fuel surcharge to offset its increased fuel costs;

    g.     Whether Airgas was unjustly enriched through its conduct; and

    h.     Whether the class waiver in the online terms is unconscionable.

**B.    Numerosity.**

40.    The total number of members of each putative class is so numerous that individual joinder is impracticable. Airgas has over a million customers nationwide.

**C.    Typicality.**

41.    The claims of the named Plaintiffs are typical of the claims of the classes. Plaintiffs, like other class members, entered into the form contract, paid the unlawful fuel surcharges, and had the true nature of the fuel surcharges concealed from them. Plaintiffs were subject to, and harmed by, the exact same common policies and practices which effected all class members.

**D.    Adequacy.**

42.    Plaintiffs will fairly and adequately protect the interests of the members of the class and have no interest antagonistic to those of other class members. Plaintiffs share the same interests and were harmed by the same conduct as each other class member. Resolution of this case will inherently vindicate and redress the interests of Plaintiffs equally with those of class members. Plaintiffs have retained class counsel competent and experienced in prosecuting class actions and such class counsel is financially able to represent the classes.

**E.    Superiority and Manageability.**

43.    The class action is superior to other available methods for the fair and efficient

adjudication of this controversy. Individual joinder of all members of the class is impracticable. While the total amount at issue in this litigation is large, individual damages for a given plaintiff are comparatively small and class members have little incentive to pursue individual claims. The interests of judicial economy favor adjudicating the claims for the Plaintiffs classes in a single forum rather than on an individual basis, thus also ensuring consistent adjudications and a uniformity of decision. The proposed class definitions are objective and class membership is easily determined using customer information and financial records maintained by Airgas in electronic form. Calculation of damages can be accomplished using systematic means and objective criteria. The class action mechanism is administratively feasible and provides the benefit of unitary adjudication, economies of scale and comprehensive supervision by a single court.

## VI.     CAUSES OF ACTION

### COUNT I

### BREACH OF CONTRACT

44.     Plaintiffs incorporate paragraphs 15 through 25, detailing the factual predicate of breach of contract, into this claim.

45.     Plaintiff Union County EMS SC and every member of the Written Contract Class entered into a form written contract with Airgas. Plaintiff Upstate Oral & Maxillofacial Surgery, P.A. entered into a form online contract with Airgas whereby the online "terms and conditions" were incorporated through paper invoices and delivery orders provided at the time of sale. Both form contracts contain an identical provision governing when Airgas may assess surcharges. Specifically, the surcharge provision establishes that Airgas can assess surcharges in the event of "extraordinary, emergency, or other unanticipated increases in the cost of manufacturing, supplying or distributing" products.

46.     Plaintiffs and each member of the class performed on their agreements by paying the fuel surcharges assessed.

47.     Airgas breached the uniform surcharge contractual provision by charging "fuel surcharges" that were not caused by, related to, or used to offset any "extraordinary, emergency, or other unanticipated increases" in fuel (or any other) costs. There was no such event that led to the implementation of the fuel surcharge. The fuel surcharge is not related to or based upon any fuel costs Fuel costs have decreased since the implementation of the fuel surcharge, but Airgas continues to assess it. In fact, Airgas recovers all such increased costs through delivery fees, price increases, and other charges.

48.     Plaintiffs did not agree to pay the fuel surcharge assessed. Plaintiffs agreed to pay a fuel surcharge that was charged as a result of, related to, and as a pass-through of extraordinary, emergency, or other unanticipated increases" in fuel costs. The fuel surcharge imposed by Airgas was not the result of, related to, or a pass-through of any such costs. Further, neither Plaintiffs nor any putative class member did or could know as much due to Airgas's intentional scheme to hide the true nature and purpose of the fuel surcharge from its customers.

49.     Plaintiffs and each putative class member have been directly and proximately harmed by Airgas's breach of contract. Each paid the unlawful "fuel surcharges," and thus paid more as agreed as a direct result of Airgas's unlawful conduct. Plaintiffs on their own behalf and on behalf of the classes seek all damages, including the return of the full amount of all fuel surcharges paid.

## COUNT II

### BREACH OF CONTRACT THROUGH BREACH OF
### THE DUTY OF GOOD FAITH AND FAIR DEALING

50.     Plaintiffs incorporate paragraphs 15 through 25, detailing the factual predicate of

18

breach of contract, into this claim.

51.     To the extent necessary, this count is pled in the alternative.

52.     Plaintiff Union County EMS SC and every member of the Written Contract Class entered into a form written contract with Airgas.  Plaintiff Upstate Oral & Maxillofacial Surgery, P.A. entered into a form online contract with Airgas whereby the online "terms and conditions" were incorporated through paper invoices and delivery orders provided at the time of sale. Both form contracts contain an identical provision governing when Airgas may assess surcharges. Specifically, the surcharge provision establishes that Airgas can assess surcharges in the event of "extraordinary, emergency, or other unanticipated increases in the cost of manufacturing, supplying or distributing" products.

53.     Plaintiffs and each member of the class performed on their agreements by paying the fuel surcharges assessed.

54.     In every contract, there exists an implied covenant of good faith and fair dealing. This covenant becomes a term of the contract.  It requires a party to that contract to act according to reason and justice to carry out the purpose of the contract, to protect the interests of all contracting parties, and to exercise any discretion it may have under the contract in good faith.

55.     Airgas violated this covenant and breached the uniform contractual term by assessing "fuel surcharges" that were not related to, used to offset, or a result of any increase in fuel costs.  Such charges were solely hidden profit devices and Airgas recovers all fuel costs through other means, including the delivery fees and price increases. Airgas abused any discretion it maintained to impose surcharges by acting in bad faith to unilaterally and unreasonably increase the total prices charged to Plaintiffs and putative class members through the fuel surcharges.  There was no legitimate business reason—other than deriving unearned profit—for its conduct.  The

purpose of the contract is to set a price for goods and services and Airgas violated the reasonable expectation of Plaintiffs and putative class members by inflating this price through the deceptive and unlawful fuel surcharge.

56.     Plaintiffs did not agree to pay the fuel surcharge assessed.  Plaintiffs agreed to pay a fuel surcharge that was charged as a result of, related to, and as a pass-through of extraordinary, emergency, or other unanticipated increases" in fuel costs.  The fuel surcharge imposed by Airgas was not the result of, related to, or a pass-through of any such costs.  Further, neither Plaintiffs nor any putative class member did or could know as much due to Airgas's intentional scheme to hide the true nature and purpose of the fuel surcharge from its customers.

57.     Plaintiffs and each putative class member have been directly and proximately harmed by Airgas's breach of contract. Each paid the unlawful "fuel surcharges," and thus paid more as agreed as a direct result of Airgas's unlawful conduct.  Plaintiffs on their own behalf and on behalf of the classes seek all damages, including the return of the full amount of all fuel surcharges paid.

**COUNT III**

**UNJUST ENRICHMENT**

58.     Plaintiffs incorporate paragraphs 14 through 25, detailing the factual predicate of this claim, herein.

59.     To the extent necessary, this count is pled in the alternative.

60.     Through its fuel surcharge practices, Airgas received money from the putative class which in equity and justice it should not be permitted to keep.   By charging and collecting fuel surcharges which it knew to be not justified by any fuel cost it incurred, by suppressing and misrepresenting material facts (including that it would charge a fuel surcharge that was unrelated

to its actual or increased fuel costs), and by engaging in other wrongful and unlawful conduct as set out herein, Airgas obtained money which properly belongs to the putative class. The benefit conferred by the putative class was non-gratuitous and Airgas realized value from this benefit. It would be inequitable for Airgas to retain this benefit.

61.     Plaintiffs and each member of the class have been directly and proximately harmed by Airgas conduct in that each paid an unlawful and arbitrary fuel surcharge.

## COUNT VII

### FRAUD
### (On Behalf of Plaintiffs Individually)

62.     Plaintiffs incorporate paragraphs 15 through 25, detailing the factual predicate of this claim, herein.

63.     To the extent necessary, this count is pled in the alternative.

64.     Airgas misrepresented the nature and purpose of the fuel surcharge to Plaintiffs. It did partly through using the term "fuel surcharge." It made these misrepresentations on each invoice it used to charge this fee. Such documents are within Airgas's possession and control but, upon information and belief, were sent monthly to Plaintiffs at the beginning of each month. Airgas itself—through its executive officers and employees—made these misrepresentations. These misrepresentations are false because the fuel surcharge in neither intent nor effect is related to, charged to recover, or used to offset any increased fuel costs. It is neither a "surcharge" nor related to "fuel." Rather, it is a hidden profit device Airgas misnames to deceive Plaintiffs. Airgas chose and uses this representation to assess the fee intentionally to convey a false message regarding the legitimacy, use, and nature of the fee.

65.     Additionally, throughout the class period, Airgas has withheld material information from Plaintiffs it was required to disclose. Airgas did not disclose that the fuel surcharge is not

21

related to its costs of fuel or used to recover such costs.  Nor did it disclose the fact that any increased fuel costs it incurs are already recovered fully through other ancillary charges, such as the delivery fee and price increases.  Airgas did not disclose that it does not use the fuel surcharge to offset its fuel costs or that it profits from the fees.

66.     Through its misrepresentations and omissions, Airgas obtained the payments of the fuel surcharges from Plaintiffs to which it was not entitled. Plaintiffs justifiably relied upon Airgas' representations to their detriment in that they paid the improper fuel surcharges and were directly and proximately damaged thereby.

## VII.     PRAYER FOR RELIEF

67.     Plaintiffs, on behalf of itself and each member of the putative classes, demands all damages available, including all fuel surcharges paid to Airgas, restitution, interest, attorneys fees, costs, and judgement that the fuel surcharges are unlawful.

Respectfully Submitted,

*/s/ T. Ryan Langley*
T. Ryan Langley
**HODGE & LANGLEY, PC**
Federal ID No. 002537
229 Magnolia Street
PO Box 2765
Spartanburg, SC 29304
864.585.3873

Oscar M. Price, IV
Nicholas W. Armstrong
Garrett Owens
**PRICE ARMSTRONG, LLC**
Price Armstrong, LLC
2226 1st Avenue South, Suite 105
Birmingham, AL 35233
205.706.7527

22

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2020 I filed the foregoing using the CM/ECF system, thereby providing notice to all counsel of record.

*/s/ T. Ryan Langley*
T. Ryan Langley